1      HONORABLE RONALD B. LEIGHTON

2

3

4

5

6                    UNITED STATES DISTRICT COURT
7                  WESTERN DISTRICT OF WASHINGTON
                             AT TACOMA
8

RANDALL CASHATT, BRANDON              CASE NO. 3:19-cv-05886-RBL
9   KENDALL,DAVID HODEL, CHAD
   PRENTICE, BETHJOSWICK, and          ORDER ON DEFENDANT'S MOTION
10  JEFFREY HEATH, individually and on  TO DISMISS AND MOTION TO
   behalf of all others similarly situated,,  STRIKE CLASS ALLEGATIONS
11
                    Plaintiff,          DKT. ## 22, 23
12        v.

13  FORD MOTOR COMPANY,

14                  Defendant.

15

16                          **INTRODUCTION**

17        THIS MATTER is before the Court on Defendant Ford Motor Company's Motion to

18  Strike Class Allegation [Dkt. # 22] and Motion to Dismiss for Failure to State a Claim

19  [Dkt. # 23]. Plaintiffs are law enforcement officers who were issued 2011-2018 model year Ford

20  Explorers. Plaintiffs allege that these vehicles have a design flaw that causes carbon monoxide to

21  leak into the passenger compartment, which injured Plaintiffs in various ways. Ford now argues

22  that Plaintiffs' claim for fraudulent concealment is preempted by the Washington Products

23  Liability Act (WPLA) and that Plaintiffs' WPLA claim is conclusory. Ford further seeks to

24

1   short-circuit this products liability class action because of the individualized issues it raises. The

2   Court agrees with Ford and GRANTS its Motions.

3   **BACKGROUND**

4   Plaintiffs allege that Ford's 2011-2018 Explorers were designed and manufactured with a

5   flaw that "cause[s] the presence of exhaust fumes, including carbon monoxide, in the passenger

6   compartment while the vehicles are in use." FAC, Dkt. # 21, at 8. Carbon monoxide poisoning

7   can cause such symptoms as "headaches, dizziness, weakness, upset stomach, vomiting, chest

8   pain, and confusion." *Id*. at 9-10. Plaintiffs allege that Ford has known about the exhaust fume

9   defect in its Explorers since 2012 but concealed that information from Plaintiffs and other

10  officers and continued to sell its vehicles to police departments. *Id*. at 11-12.

11  Plaintiffs incorporate several consumer complaints to the National Highway

12  Transportation Safety Administration (NHTSA). FAC at 13-18. These complaints describe

13  fumes entering the vehicles cabin, resulting in symptoms ranging from a strong smell to

14  tiredness, headaches, nausea, vomiting, dizziness, lightheadedness, and passing out. *Id*. NHTSA

15  has apparently received 2,700 such complaints, with some resulting in crashes. *Id*. at 19. With

16  respect to the Ford Explorer Police Interceptor issued to officers, the NHTSA has reported that

17  these vehicles "may be 'experiencing exhaust manifold cracks, which appear to present a low

18  level of detectability, and may explain the exhaust odor.'" *Id*. at 20.

19  Ford has also received 2,400 reports from customers. FAC at 19. Ford has responded by

20  issuing several Technical Service Bulletins (TSB) to dealerships with procedures for addressing

21  the exhaust issues, though Plaintiffs allege that Ford's efforts have been unsuccessful. *Id*. at 19,

22  20, 22. One stated that "[s]ome 2011-2015 Explorer vehicles may exhibit an exhaust odor in the

23

24

1    vehicle with the auxiliary climate control system on." *Id*. at 20. Ford also announced that drivers

2    of non-police explorers should not be concerned. *Id*. at 21.

3         The FAC is light on specific allegations about Plaintiffs' use of Ford Explorers.

4    However, Plaintiffs do claim that they "became sick, disorganized, foggy headed, suffered

5    medical illnesses; heart attack like symptoms, chronic carbon monoxide poisoning, acute carbon

6    monoxide poisoning, fatigue, nausea and other disabling injury" as a result of the exhaust fume

7    defect. FAC at 34. Plaintiffs also claim that they materially relied on Ford's misrepresentations

8    and would not have operated the vehicles had they known of the defect. *Id*. at 5-6. Plaintiffs

9    assert claims for fraudulent concealment and violation of the WPLA. *Id*. at 30-34.[1] *Id*. at 30-34.

10   Plaintiffs ask for injunctive and declaratory relief against Ford's fraudulent business practices, as

11   well as punitive damages and an award of "costs, medical and related expenses and economic

12   damages under applicable law, and compensatory damages for economic loss, and out-of-pocket

13   costs in an amount to be determined at trial . . . [and] applicable statutory and civil penalties." *Id*.

14   at 35.

15        In addition to asserting individual claims, Plaintiffs want to represent a class of "[a]ll law

16   enforcement officers in the State of Washington who drove a class vehicle," i.e., a 2011-2018

17   Ford Explorer. FAC at 25. Plaintiffs assert that there are common issues related to the class,

18   including whether the vehicles have a design defect, whether the defect presents a safety hazard,

19   and "[w]hether Defendant violated the Washington State Products Liability Statute." *Id*. at 27-

20   28.

21

22

23   ---
     [1] Plaintiffs confusingly style their claim as falling under the Washington Consumer Protection
     Act, which is codified at RCW 19.86, but then describe it as a products liability action and
24   reference RCW 7.72.020.

1

## DISCUSSION

2

**1.    Motion to Dismiss**

3

***a.    Legal Standard***

4

Dismissal under Fed. R. Civ. P. 12(b)(6) may be based on either the lack of a cognizable

5

legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri*

6

*v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff's complaint must allege

7

facts to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662,

8

678 (2009). A claim has "facial plausibility" when the party seeking relief "pleads factual

9

content that allows the court to draw the reasonable inference that the defendant is liable for the

10

misconduct alleged." *Id*. Although the court must accept as true the Complaint's well-pled facts,

11

conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper

12

12(b)(6) motion to dismiss. *Vazquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007);

13

*Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

14

"[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires

15

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

16

will not do. Factual allegations must be enough to raise a right to relief above the speculative

17

level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnotes omitted).

18

This requires a plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-

19

me-accusation." *Iqbal*, 556 U.S. at 678 (citing *id.*). On a 12(b)(6) motion, "a district court should

20

grant leave to amend even if no request to amend the pleading was made, unless it determines

21

that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss &*

22

*Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

23

24

1     ***b.     Fraudulent Omission Claim***

2         Ford first argues that Plaintiffs' common law fraud claim is preempted by the WPLA,

3     RCW 7.72 *et seq*. Alternatively, Ford contends that Plaintiffs' fraud claim should be dismissed

4     because none of the plaintiff officers entered into a transaction with Ford, which means Ford

5     owed them no affirmative duty. In response, Plaintiffs argue that the WPLA does not preempt

6     fraud claims and assert that the FAC properly alleges all nine elements of fraud.

7         "The WPLA would accomplish little if it were a measure plaintiffs could choose or refuse

8     to abide at their pleasure." *Washington Water Power Co. v. Graybar Elec. Co.*, 112 Wash. 2d

9     847, 855 (1989). In its definition of a "products liability claim," the WPLA includes:

10            any claim or action previously based on . . . breach of, or failure to, discharge a
              duty to warn or instruct, whether negligent or innocent; misrepresentation,
11            concealment, or nondisclosure, whether negligent or innocent; or other claim or
              action previously based on any other substantive legal theory except fraud,
12            intentionally caused harm or a claim or action under the consumer protection act.

13     RCW 7.72.010. Washington courts have recognized that the WPLA supplants common law

14    claims based on concealment related to a product. *See, e.g., Potter v. Wilbur-Ellis Co.*, 62 Wash.

15    App. 318, 325 (1991) (explaining that plaintiffs' WPLA claim will succeed if they "can show the

16    failure to inform them of the lawn damage Green Baron experienced when applying the chemical

17    was intentional concealment of information about the product"); *Fagg v. Bartells Asbestos*

18    *Settlement Tr.*, 184 Wash. App. 804, 812, 339 P.3d 207, 211 (2014).

19         Although Plaintiffs try to latch onto the WPLA's mention of fraud claims as exempt from

20    preemption, Ford is correct that their claim is ultimately based on concealment of a product

21    defect. Plaintiffs allege (ad nauseum) that Ford knew about the defect with its vehicles but

22    omitted/concealed that information from Plaintiffs and others, leading them to suffer damages.

23    This is, in essence, a products liability claim for which the WPLA is the exclusive remedy.

24

1    There is a further problem with Plaintiffs' fraud claim, which is that none of the plaintiff

2    officers actually entered into a transaction with Ford to operate its vehicles; instead, they were

3    issued the vehicles by their departments. Consequently, their damages could not have arisen

4    purely out of Ford's alleged fraud, as would be the case if Ford had sold them defective vehicles

5    that are worth less than had been represented. Plaintiffs' injuries are inherently connected to

6    Ford's products themselves because they arose from merely operating the vehicles, not buying

7    them. FAC, Dkt. # 21, at 32-33. Plaintiffs' assertions that their fraud claim is "different" from

8    their products liability claim thus rings hollow. The fraudulent omission claim is preempted by

9    the WPLA and dismissed

10   *c.*      ***WPLA Claim***

11   Ford next argues that Plaintiffs' WPLA claim is conclusory and thus fails to meet the

12   pleading standard of Rule 12(b)(6). Ford points out that none of the Plaintiffs plead how or when

13   they were exposed to exhaust fumes or what model year vehicle they drove, which is relevant to

14   the statute of limitations for a WPLA claim. In opposition, Plaintiffs do little more than repeat

15   the FAC's allegations.

16   Ford is correct.  Plaintiffs' allegations are entirely conclusory and consist mostly of

17   publicly-available information cribbed from other sources, such as the NHTSA and Ford itself.

18   There is almost no detail regarding the plaintiff officers' experiences with Ford's vehicles or the

19   types of injuries they suffered. To state a plausible personal injury claim, a plaintiff must at least

20   identify how they were injured and what their injury was; a formulaic recitation of an array of

21   health problems will not do. Ford's objections to the FAC are well-founded, and Plaintiffs'

22   WPLA claim is also dismissed.

23

24

1    ### d.   *Plaintiffs' Requested Relief*

2         Ford also challenges the types of relief Plaintiffs request. First, Ford points out that the

3    WPLA does not allow recovery of purely economic or punitive damages. Second, Ford asserts

4    that Plaintiff cannot obtain a judicial recall because vehicle recalls are the exclusive province of

5    NHTSA and, alternatively, because the NHTSA has primary jurisdiction over recalls.

6         Because the Court has already determined that Plaintiffs' fraud claim is not legally viable

7    and their WPLA claim is conclusory, addressing Plaintiffs' requested relief is not strictly

8    necessary. However, in case Plaintiffs amend their WPLA claim, the Court agrees with Ford that

9    the WPLA does not allow economic or punitive damages. RCW 7.72.010(e)(6) ("'Harm' . . .

10   does not include direct or consequential economic loss under Title 62A RCW."). "The WPLA

11   explicitly confines recovery to physical harm suffered by persons and property and leaves purely

12   economic loss to the UCC." *Hofstee v. Dow*, 109 Wash. App. 537, 543 (2001). Plaintiffs describe

13   their loss as "economic," but to the extent they seek compensation unrelated to personal injury

14   such damages are prohibited.[2] Plaintiffs' request for punitive damages is likewise misguided. *See*

15   *Baughn v. Johnson & Johnson*, C15-5283 BHS, 2015 WL 4759151, at *2 (W.D. Wash. Aug. 12,

16   2015) ("The WPLA does not authorize recovery of punitive damages.").

17        Plaintiffs' request for declaratory and injunctive relief is not actually styled as a recall.

18   Rather, Plaintiffs want "[a]n order awarding declaratory relief and enjoining Defendant from

19   continuing the unlawful, deceptive, fraudulent, harmful, and unfair business conduct and

20   practices alleged herein." FAC, Dkt. # 21, at 35. As usual, Plaintiffs' request is vague and

21

22   ---

[2] Given that Plaintiffs never purchased vehicles, the Court is somewhat baffled about what

23   purely economic loss they possibly could have suffered. But this is somewhat unsurprising, as
     Plaintiffs' recurring theme in this case has been trying to fit the square peg of fraud into the

24   round hole of personal injury.

1  ambiguous, but it does not seem to imply a recall. The Court will not read anything more into the

2  FAC than Plaintiffs themselves put there.

3  **2.      Motion to Strike Class Allegations**

4  *a.     Legal Standard*

5          Under Federal Rule of Civil Procedure 12(f), the Court may strike from a pleading "any

6  redundant, immaterial, impertinent, or scandalous matter." Rule 23(d)(1)(D) also provides that a

7  court may "require that the pleadings be amended to eliminate allegations about representation of

8  absent persons and that the action proceed accordingly."[3] Striking allegations under Rule 12(f) is

9  primarily used "to avoid the expenditure of time and money that must arise from litigating

10 spurious issues by dispensing with those issues prior to trial." *Stearns v. Select Comfort Retail*

11 *Corp.*, 763 F. Supp. 2d 1128, 1139 (N.D. Cal. 2010) (quoting *Sidney–Vinstein v. A.H. Robins*

12 *Co.*, 697 F.2d 880, 885 (9th Cir.1983)). The standards for motions to strike resemble motions to

13 dismiss—the Court must consider only the pleadings and matters subject to judicial notice, view

14 the allegations in the light most favorable to the pleader, and grant leave to amend unless doing

15 so would be futile. *Id*. at 1139-40.

16         The Ninth Circuit has recognized that it is usually better to "afford the litigants an

17 opportunity to present evidence as to whether a class action [is] maintainable." *Vinole v.*

18 *Countrywide Home Loans, Inc.*, 571 F.3d 935, 942 (9th Cir. 2009). That said, a court may strike

19 class allegations if the plaintiff "[can]not make a *prima facie* showing of Rule 23's prerequisites

20

21 [3] Ford also cites Rule 23(c)(1)(A), which provides that "[a]t an early practicable time after a
   person sues or is sued as a class representative, the court must determine by order whether to
22 certify the action as a class action." However, *Vinole v. Countrywide Home Loans, Inc.*
   distinguished between a defendant's preemptive certification motion under Rule 23(c)(1)(A) and
23 a motion to strike. 571 F.3d 935, 941 (9th Cir. 2009) (distinguishing cases where the defendant
   had moved to strike). While the two motions are similar, Ford titled its motion as one to *strike* so
24 the Court will consider it as such.

1    or that discovery measures [are] 'likely to produce persuasive information substantiating the

2    class action allegations.'" *Id.* (quoting *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1313 (9th

3    Cir.1977)). Indeed, courts in this circuit have cut off class actions when little-to-no discovery had

4    taken place. *See, e.g., Stearns*, 763 F. Supp. 2d at 1152; *Phenylpropanolamine (PPA) Prod. Liab.*

5    *Litig.*, 208 F.R.D. 625, 633, 634 (W.D. Wash. 2002). Here, Ford challenges Plaintiffs' on the

6    basis of ascertainability and commonality/predominance.

7    *b.*     *Ascertainability*

8           Though the Ninth Circuit disfavors the term "ascertainability," it is nonetheless useful for

9    talking about definitional deficiencies in a class. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121,

10   1125 n.4 (9th Cir. 2017). For example, a class definition may be overbroad if it includes

11   individuals who sustained no injury and therefore lack standing to sue. *Stearns*, 763 F. Supp. 2d

12   at 1152 (striking class allegations where definition included "all persons who have merely 'used'

13   a Sleep Number bed in the past twenty-three years"). A class definition should also be based on

14   objective criteria that allows the plaintiff to identify its members. *Bee, Denning, Inc. v. Capital*

15   *All. Grp.*, 310 F.R.D. 614, 623 (S.D. Cal. 2015). On the other hand, a class definition is likely

16   inadequate if it requires extensive fact-finding just to identify members. *See Martino v. Ecolab*,

17   Inc., 2016 WL 614477, *10 n.133 (N.D. Cal. 2016). But this issue also overlaps with

18   commonality/predominance, and the administrative feasibility of a class alone is not a

19   prerequisite to certification. *Briseno*, 844 F.3d at 1128.

20          Ford argues that the current class definition is overbroad because it encompasses

21   individuals who drove a 2011-2018 Ford Explorer but sustained no injury. The Court agrees. The

22   FAC does not allege, and common sense does not suggest, that every single officer driving a

23   2011-2018 Ford Explorer has been injured by exhaust leakage. Indeed, the FAC does not even

24

contend that leakage is even a problem in all 2011-2018 Explorers. This means a substantial

number of the proposed class members would lack standing to assert a claim, making the class

definition not ascertainable.

### c.     Commonality/Predominance

To satisfy Rule 23(a)(2)'s "common question of law or fact" requirement, the plaintiffs'

claims must "depend upon a common contention" that is "capable of classwide resolution." *Wal-*

*Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). For class actions seeking monetary

damages,[4] Rule 23(a)(2)'s commonality requirement is subsumed under the Rule 23(b)(3)'s

more stringent requirement that "questions of law or fact common to class members predominate

over any questions affecting only individual members." *Amchem Prod., Inc. v. Windsor*, 521

U.S. 591, 609 (1997).

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to

warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045

(2016) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Common

questions are defined by the plaintiffs' ability to make a prima facie showing using the same

evidence. *Id.* When considering whether common issues predominate, the court should begin

with "the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton*

*Co.*, 563 U.S. 804, 809 (2011). In addition, "more important questions apt to drive the resolution

of the litigation are given more weight in the predominance analysis over individualized

---

[4] The FAC does not specify what type of class action Plaintiffs want to bring. Ford argues that
the Court should construe the FAC as proposing a Rule 23(b)(3), rather than 23(b)(2), class
action because Plaintiffs request compensatory damages that are more than "incidental" to their
desired declaratory and injunctive relief. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360
(2011) (holding that only claims for monetary relief that is incidental to declaratory/injunctive
relief can fit under Rule 23(b)(2)). Plaintiffs make no opposing arguments. The Court agrees
with Ford and will consider this as a putative Rule 23(b)(3) class action.

1   questions which are of considerably less significance to the claims of the class." *Torres v.*

2   *Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).

3        At the pleadings stage, courts have struck class allegations where an element to the

4   plaintiff's claims inherently involves individualized inquiries. *See, e.g., Stearns*, 763 F. Supp. 2d

5   at 1152-53 (individualized questions about causation and reliance made class action unfeasible);

6   *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009) (fraud claim would require

7   individualized inquiries into reliance). Although they are not per se unviable, products liability

8   cases present special difficulties for commonality and predominance. *Zinser v. Accufix Research*

9   *Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001). Variation in causation is especially challenging

10  in products liability class actions, and many courts have declined certification on this basis. *See,*

11  *e.g., id.* at 1189 (finding lack of commonality due to causation and choice of law issues); *In re*

12  *PPA*, 208 F.R.D. at 633, 634 (granting motion to strike class allegations in products liability

13  case).

14       In *Amchem Products, Inc. v. Windsor*, the Supreme Court affirmed denial of certification

15  in a class action based on asbestos exposure. 521 U.S. 591, 612 (1997). In doing so, the court

16  explained how such a product-based case was different from mass torts involving a single

17  accident because "class members . . . were exposed to different asbestos-containing products, in

18  different ways, over different periods, and for different amounts of time; some suffered no

19  physical injury, others suffered disabling or deadly diseases." *Id.* at 609. Unlike mass torts cases

20  where "the cause of injury was never in question," products liability claims inevitably produce a

21  plethora of causal scenarios. *PPA*, 208 F.R.D. at 632.

22       Ford argues that Plaintiffs' claims demonstrate exactly this problem with causation. Ford

23  points out that it will first be necessary to establish that the exhaust defect actually manifested in

24

1   each vehicle. The TSBs issued by Ford were "directed to specific operating conditions and

2   potential manufacturing variances that may or may not be present in any specific vehicle."

3   Motion to Strike, Dkt. # 22, at 7. Then, Ford asserts that some vehicles used by police are

4   upfitted post-sale, requiring more analysis of whether the leak originated with Ford. In response,

5   Plaintiffs insist that "all of these police vehicles leak exhaust emissions." Opposition, Dkt. # 31,

6   at 11. This is in contrast to the FAC, which quotes both Ford's TSBs and the NHTSA as stating

7   that the vehicles "may" have issues with exhaust leakage. FAC, Dkt. # 21, at 20. Plaintiffs

8   simultaneously argue that there is a common question of whether the police vehicles suffer from

9   a design flaw.

10          The Court agrees with Ford that individualized questions far outstrip common ones in

11   this case. RCW 7.72.030(1) provides that "A product manufacturer is subject to liability to a

12   claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in

13   that the product was not reasonably safe as designed or not reasonably safe because adequate

14   warnings or instructions were not provided." Even if Plaintiffs were able to establish that *all*

15   2011-2018 Ford Explorers used by police have the design flaw, there would still be the further

16   issue of whether the flaw manifested to a meaningful degree in each vehicle and whether there

17   could be alternate causes of the leak.

18          More problems arise from the breadth of Plaintiffs' class, which encompasses officers

19   with utterly distinct types of injuries ranging from minor "foggy headed[ness]" to "heart attack

20   like symptoms" to "chronic carbon monoxide poisoning." It is also conceivable that some class

21   members could have gotten in crashes due to the effects of carbon monoxide, as some

22   complainants to the NHTSA did. Such variety of injuries will introduce a variety of

23   individualized causation issues: If the symptoms were minor, was exhaust clearly the cause? If

24

1   the class members had heart symptoms, do they have an underlying heart condition? If the class

2   member got in a crash, were they or someone else at fault? In short, the FAC brings up too many

3   individualized issues for certification to be plausible.

**CONCLUSION**

5   Ford's Motions are GRANTED. Plaintiffs' fraudulent concealment claim is DISMISSED

6   with prejudice. The Court grants Plaintiffs leave to amend their WPLA claim to address the

7   shortcoming discussed in this Order.

8   As for the class allegations, the Court has grave doubts about whether Plaintiffs' personal

9   injury claims are amenable to the class action format. However, Plaintiffs FAC is currently so

10  vague and poorly pled that the Court cannot say with certainty that a narrower, better-defined

11  class action would be destined to fail. This is also the first time the Court has weighed in on

12  Plaintiffs' pleadings. Accordingly, Plaintiffs have one chance to sharpen their class definition

13  and allegations. Any amendments should narrow the class in such a way that causal variation is

14  minimized. This may or may not be possible, but Plaintiffs should have an opportunity to try.

15  Plaintiffs have 30 days from the date of this Order to file a new complaint with an

16  amended WPLA claim and amended class allegations. Failure to do so will result in this case

17  being dismissed without further notice in 30 days.

18  IT IS SO ORDERED.

19  Dated this 27th day of April, 2020.

21  Ronald B. Leighton
    United States District Judge