UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RANDALL CASHATT, et al.,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>FORD MOTOR COMPANY,<br><br>　　　　　　　　Defendant. | CASE NO. 19-CV-05886-LK<br><br>ORDER DENYING DEFENDANT'S MOTION TO SEVER |

This matter comes before the Court on Defendant Ford Motor Company's Motion to Sever Plaintiffs' Claims for Trial. Dkt. No. 81. The motion is denied.

## I. BACKGROUND

The Court has already set forth the procedural history of this case. *See* Dkt. No. 77 at 2–7. It therefore declines to recount every detail here. Some repetition, however, is necessary for ease of reference.

Plaintiffs Randall Cashatt, Brandon Kendall, David Hodel, Chad Prentice, Beth Joswick, and Jeffrey Heath are Washington State Patrol Troopers who were issued Ford Police Interceptor SUVs in the course of their employment. Dkt. No. 78 at 1, 3, 9. Their fourth amended complaint

accuses Ford of violating Washington's Product Liability Act. *Id.* at 8, 35–37; *see* Wash. Rev. Code § 7.72.030. Specifically, they allege that their Interceptors "were designed, engineered and manufactured by Ford with design flaws and/or defective exhaust and/or HVAC Systems that cause the presence of exhaust fumes, including carbon monoxide, in the passenger compartment while the vehicles are in use (the 'Exhaust Fume Defect')." Dkt. No. 78 at 36; *see also id.* at 4, 19–21 (describing the Exhaust Fume Defect). Plaintiffs claim that the Interceptors were not "reasonably safe" at the time of design because the likelihood and seriousness of the resulting harm (carbon monoxide poisoning) outweighed both the burden of designing a vehicle that would have prevented the harm and the adverse effect that a practical and feasible alternative design would have on the usefulness of the vehicle. *Id.* at 37; *see* Wash. Rev. Code § 7.72.030(1)(a). Ford allegedly knew about these purported defects and, instead of issuing a recall, concealed them and continued to sell the affected vehicles to the Washington State Patrol. Dkt. No. 78 at 6–7, 23–25.

As for injuries, Plaintiffs assert that they "became sick, disorganized, [and] foggy headed," and "suffered medical illnesses" such as "heart attack[-]like symptoms, chronic carbon monoxide poisoning, acute carbon monoxide poisoning, fatigue, nausea and other disabling injury"—all the result of "their exposure to the deadly gasses which intruded the passenger compartments of their affected vehicles[.]" *Id.* at 36–37; *see also id.* at 9–10 (Plaintiffs detected exhaust fumes in the passenger compartment and reported "the same or very similar symptoms including headaches, vomiting, ringing in the ear, heart palpitations, nausea, foggy thinking, and flu[-]like symptoms after being in the affected vehicles as drivers or passengers.").

Ford moves to sever Plaintiffs' claims. Dkt. No. 81. It contends that Plaintiffs "do not meet the criteria for permissive joinder because their claims do not arise out of the same series of transactions or occurrences." *Id.* at 1. According to Ford, this case does not involve a "single incident in which the Plaintiffs were simultaneously injured"; rather, Plaintiffs assert "different

injuries, separately occurring on different dates and at different places, allegedly caused by seven different Ford vehicles of various model years." *Id.*

## II.   DISCUSSION

The Court first addresses Ford's request to strike Plaintiffs' opposition brief. It then reaches the merits of the motion to sever.

**A.   Request to Strike**

Ford asks the Court to strike as untimely Plaintiffs' opposition brief, which is erroneously captioned as a "reply." Dkt. No. 83 at 5–6; *see* LCR 7(g); Dkt. No. 82 at 1 (Plaintiffs' opposition brief). Ford filed its motion to sever on Thursday, June 9, 2022, and properly noted it for Friday, June 24, 2022. Dkt. No. 81; *see* LCR 7(d)(3). Plaintiffs' opposition brief was therefore due no later than Tuesday, June 21st (a day later than usual due to the federally recognized Juneteenth holiday). *See* LCR 6(a), 7(d)(3). Plaintiffs' counsel, however, neglected to file an opposition brief until late in the afternoon on Wednesday, June 22nd. Dkt. No. 82.

"The Court has the discretion to strike untimely pleadings that fail to comply with local rules." *Allstate Indem. Co. v. Lindquist*, No. C20-1508-JLR, 2020 WL 7075215, at *1 (W.D. Wash. Dec. 3, 2020). Although the Court may summarily do so, *see, e.g.*, *Pierson v. Miniat*, No. C21-1317-SKV, 2022 WL 43520, at *1 (W.D. Wash. Jan. 5, 2022), usually the moving party must justify that remedy by demonstrating sufficient prejudice from the untimely filing, *see, e.g.*, *Knight v. Wal-Mart Stores, Inc.*, No. C08-5746-RJB, 2009 WL 4544734, at *1 (W.D. Wash. Nov. 25, 2009) (the court "favors resolving cases on the merits where possible," especially "[w]here no prejudice is caused" by counsel's "negligence in failing to carefully read" court rules).

Ford complains that Plaintiffs' belated filing left it "with two fewer days" to prepare a reply. Dkt. No. 83 at 5. As Ford acknowledges, though, the Court previously confronted a materially identical situation and found any prejudice stemming from the missed deadline

insufficient to warrant striking the untimely brief. *Id.* at 5; *see Bell v. Boeing Co.*, No. 20-CV-01716-LK, 2022 WL 1206728, at *2 (W.D. Wash. Apr. 22, 2022) (declining to strike opposition and supporting declarations filed two days after deadline). As was the case in *Bell*, the issue presented in Ford's motion to sever is not complex. *See* 2022 WL 1206728, at *2 (admissibility of expert report was not a particularly complex issue); *Bates v. State Farm Mut. Auto. Ins. Co.*, No. C14-1557-JLR, 2015 WL 11714360, at *2 (W.D. Wash. Oct. 19, 2015) ("The issues raised in State Farm's initial motion are narrow and not particularly complex . . . , and the court finds that State Farm has suffered only minimal prejudice by losing two days of its time to prepare a reply memorandum."). And, like the aggrieved defendant in *Bell*, Ford mustered a full six-page reply squarely addressing Plaintiffs' arguments. *See* 2022 WL 1206728, at *2. Ford's request to strike Plaintiffs' opposition brief is denied.

**B.      Motion to Sever**

Permissive joinder is appropriate only when the plaintiffs each assert a right to relief "arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all plaintiffs will arise in the action." Fed. R. Civ. P. 20(a)(1). If joined plaintiffs fail to meet both requirements, Federal Rule of Civil Procedure 21 permits the district court to sever the misjoined plaintiffs "so long as no substantial right will be prejudiced by the severance." *Coughlin v. Rogers*, 130 F.3d 1348, 1350 (9th Cir. 1997). But even when Rule 20(a)(1)'s threshold requirements are met, a district court must also "examine whether permissive joinder would 'comport with the principles of fundamental fairness' or would result in prejudice to either side." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1296 (9th Cir. 2000) (quoting *Desert Empire Bank v. Ins. Co. of N. Am.*, 623 F.2d 1371, 1375 (9th Cir. 1980)).[1]

---

[1] At least one Court in this district has adopted a five-factor test for determining whether severance under Rule 21 is proper: (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present common

Rule 20 is nonetheless "construed liberally in order to promote trial convenience and to expedite the final determination of disputes, thereby preventing multiple lawsuits." *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 558 F.2d 914, 917 (9th Cir. 1977); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966) ("Under the Rules, the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."). The same-transaction and common-question requirements are "not rigid tests, but rather are flexible concepts used by the courts to implement the purpose of Rule 20 and therefore are to be read as broadly as possible whenever doing so is likely to promote judicial economy." *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1187–88 (C.D. Cal. 2015) (cleaned up). District courts, however, ultimately retain "broad discretion" over severance decisions. *Coleman*, 232 F.3d at 1297.

1. Same Series of Transactions or Occurrences

As previewed above, Ford contends that Plaintiffs' allegations do not arise out of the same transaction or occurrence because they do not share a similar factual background and lack uniformity. Dkt. No. 81 at 4. "[E]ach individual Plaintiff," Ford argues, "alleges varied personal injuries occurring at different times—often separated by years—in different Ford Police Interceptors, often of different model years." *Id.* at 6. It believes that these claims should proceed separately because each involves different witnesses; different facts about the frequency, duration, and amount of carbon monoxide exposure; different circumstances and conditions; and different dealership maintenance and repair records. *Id.* In Ford's view, the parties will need to conduct

---

questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance is granted; and (5) whether different witnesses and documentary proof are required for the separate claims. *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. C10-861-RSM, 2013 WL 6008308, at *3 (W.D. Wash. Nov. 13, 2013). The first two factors incorporate Rule 20(a)(1)'s requirements, while the fourth appears to reflect the prejudice inquiry called for in *Coleman* and *Desert Empire Bank*. And, as set forth below, the third and fifth factors involve considerations that are addressed through the same-transaction inquiry.

ORDER DENYING DEFENDANT'S MOTION TO SEVER - 5

discovery on each plaintiff's medical history, underlying comorbidities, education, and employment history. *Id.* Although this case involves some individualized inquiries with respect to each plaintiff and his or her claim, the factual disparities are not of a sufficient magnitude to defeat permissive joinder—at least not on this record and at this stage.

Rule 20(a)(1) "[b]y its terms . . . requires factual similarity in the allegations supporting Plaintiffs' claims." *Visendi v. Bank of Am., N.A.*, 733 F.3d 863, 870 (9th Cir. 2013). But joined plaintiffs must do more than allege that the defendant violated the same law in comparable ways. *Id.*; *see also, e.g.*, *New Sensations, Inc. v. Does 1-426*, No. 12-3800-JSC, 2012 WL 4675281, at *7 (N.D. Cal. Oct. 1, 2012). Courts are "inclined to find that claims arise out of the same transaction or occurrence when the likelihood of overlapping proof and duplication in testimony indicates that separate trials would result in delay, inconvenience, and added expense." 7 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1653 (3d ed.) (same).

Here, Plaintiffs' allegations indicate that there is a high likelihood of overlapping proof and duplication of testimony. True enough, each plaintiff was exposed to carbon monoxide and other poisonous exhaust fumes at different times and in different quantities. And each plaintiff has unique medical histories with, perhaps, underlying comorbidities. But Ford's focus on the degree and frequency of exposure misses the mark. So too does its overemphasis of the minute differences between the conditions and circumstances of each case. Although there are individualized causation issues each plaintiff will need to overcome to succeed on the merits, Ford's arguments elide major, overarching similarities between each claim—similarities that will entail the same or similar testimony from the same witnesses. *See* Dkt. No. 82 at 3 ("The experts in the case, medical providers, fleet managers, industrial hygienists, and engineers from Ford, will all be the same, and [will] provide the same or similar testimony.").

The following table compiles the allegations specific to each plaintiff:

| Trooper | Model Year | Defect | Repairs | Timing of Injury | Symptoms |
|---|---|---|---|---|---|
| Cashatt | 2015 | Cracked manifold; warped "Y" pipes; exhaust fumes leaking from manifold adjacent to fresh air intakes | Replacement of catalytic converter, manifold assembly, and muffler; exhaust problem repeated despite "repair" | 2/14/2017 and 2/21/2018 | Carbon monoxide poisoning; dizziness; nausea; heart palpitations; loss of consciousness; long-term, flu-like symptoms; and permanent neurological damage |
| Hodel | 2015 | Cracked manifold; warped "Y" pipes; exhaust fumes leaking from manifold adjacent to fresh air intakes | Vehicle was repaired but no specifics are alleged; exhaust problem repeated despite "repair" | 12/17/2018, 1/3/2019,[2] and 1/31/2019 | Carbon monoxide poisoning; loss of consciousness; severe headaches; heart palpitations; increased heart rate; nausea; and "foggy thinking" |
| Joswick | 2015 | Cracked manifold; warped "Y" intake; exhaust fumes leaking from manifold adjacent to fresh air intakes | Replacement of manifold assembly, "Y" intake, and catalytic converter | 3/30/2017 | Carbon monoxide poisoning; nausea; vomiting; severe headaches; flu-like symptoms; and drowsiness |
| Kendall | 2014 and 2016 | Cracked manifold; warped "Y" intake; exhaust fumes leaking from manifold adjacent to fresh air intakes | Vehicle was repaired but no specifics are alleged; exhaust problem repeated despite "repair" | 8/8/2018, 8/26/2018, 10/23/2018, 10/26/2018, and 11/1/2018 | Carbon monoxide poisoning; increased heart rate; profuse sweating; lightheadedness; severe headaches; nausea; heart palpitations; flu-like symptoms; and anxiety |
| Prentice | 2016 | Cracked manifold; warped "Y" intake; exhaust fumes leaking from manifold adjacent to fresh air intakes | Vehicle was repaired but no specifics are alleged; exhaust problem repeated despite "repair" | 2/21/2018, 2/22/2018, 2/23/2018, 7/10/2018, and 7/11/2018 | Carbon monoxide poisoning; nausea; severe headaches; increased heart rate; heart palpitations; anxiety; loss of consciousness; and tinnitus |
| Heath | 2015 | Cracked manifold; warped "Y" intake; exhaust fumes leaking from manifold adjacent to fresh air intakes | Vehicle was repaired but no specifics are alleged | 4/18/2017 | Carbon monoxide poisoning; lightheadedness; rapid heart rate; loss of consciousness; vomiting |

---

[2] The complaint states that Trooper Hodel's second exposure occurred on January 3, 2018, but the remaining allegations indicate that this exposure occurred on January 3, 2019. See Dkt. No. 78 at 12.

ORDER DENYING DEFENDANT'S MOTION TO SEVER - 7

*See* Dkt. No. 78 at 10–16.

Plaintiffs claim damages stemming from the same core problem: an alleged defect common to all Interceptors on the market in the relevant time period. "These allegations readily satisfy the requirement of a series of logically related transactions under Rule 20(a)." *Kehr ex rel. Kehr v. Yamaha Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 827 (S.D.N.Y. 2008) (finding Rule 20(a) satisfied where plaintiffs each "allege[d] as a basis for their complaint an accident in a Rhino, which due to such design defects, was unreasonably dangerous and prone to tip over."); *see also, e.g.*, *Miller v. Nissan N. Am., Inc.*, No. 4:18CV00340RLW, 2018 WL 4211370, at *3 (E.D. Mo. Sept. 4, 2018) (plaintiffs "alleged the same defect affected their transmissions and caused their damage and are alleging breach of the same new vehicle limited warranty," and "such a common defect and warranty is sufficient for Plaintiffs to meet the same transaction or occurrence test for permissive joinder pursuant to Rule 20(a)."); *Poleon v. Gen. Motors Corp.*, No. Civ. 1999-127, 1999 WL 1289473, at *2 (D.V.I. Jan. 5, 1999) ("Although there may be differences in the way the accidents happened or the injuries sustained by the plaintiffs, the existence of defective brake and air bag systems is central to all the cases.").

Nor are Ford's arguments regarding different model years availing. As the above table reflects, four of the six plaintiffs drove a 2015 Interceptor. The two that did not—Troopers Kendall and Prentice—operated 2014 and 2016 Interceptors. Importantly, every vehicle contained the same Exhaust Fume Defect, i.e., a cracked manifold and warped "Y" intake pipes. And each vehicle was "of the same platform." Dkt. No. 82 at 3–4. Although the "affected vehicles include some upgrades and changes from the prior model year, . . . none of those changes addressed and/or remedied the defect[.]" Dkt. No. 78 at 19; *see also id.* at 18 (alleging that model years 2011 through 2018 "are part of Ford's fifth generation of Explorer vehicles"). Thus, "[t]he fact that the [v]ehicles are differen[t] model years is largely irrelevant because the [v]ehicles, regardless of model year, all

ORDER DENYING DEFENDANT'S MOTION TO SEVER - 8

had the same [alleged defect]." *Grover v. BMW of N. Am., LLC*, 434 F. Supp. 3d 617, 624 (N.D. Ohio 2020); *see also Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, No. CV16-6514-DSF (RAOx), 2016 WL 10514773, at *1 (C.D. Cal. Nov. 3, 2016) (Rule 20(a)(1)(A)'s requirement was satisfied where Plaintiffs alleged "that common features of [different models of] dryers caused the incidents").

Ford chides Plaintiffs for their "sweeping" and "speculative" allegations related to "the vehicles' design, components and leaks[.]" Dkt. No. 83 at 3 ("[T]hese are speculative assertions that precede any discovery in this case."). According to Ford, "discovery will show that the 2016 Interceptor had a different tailgate design than the 2014 Interceptor" and "had design changes to internal components, including the Manicat (a combination of the exhaust manifold and the catalytic converter)[.]" *Id.* Be that as it may, Ford's arguments are equally speculative at this juncture as they too depend on what discovery will allegedly show with respect to vehicle design across the relevant model years. The Court cannot at this stage evaluate the degree of difference between manifold designs or ascertain the impact of any such difference on causation. It is entirely possible that—as Plaintiffs allege—the Exhaust Fume Defect plagued several generations of Interceptor notwithstanding intervening redesigns.

The Court emphasizes that the factual predicates for each claim need not be identical. Again, the controlling inquiry is whether the claims involve a sufficiently similar narrative premised on sufficiently similar conduct such that a duplication of testimony and other proof is likely. That is the case here. Each Interceptor and the resulting injuries represent different transactions with slightly different circumstances (i.e., different model years, exposure lengths and levels, and underlying medical histories). This will of course require some specific and individualized testimony. The expert testimony for each claim, however, will be mostly the same as it will center on the alleged Exhaust Fume Defect. That other details, like length and degree of

exposure, vehicle modification and maintenance, and medical history might vary and thus affect the causation analysis does not render Plaintiffs' claims misjoined. *See Cole v. Keystone RV Co.*, No. C18-5182-TSZ, 2020 WL 6059773, at *2 (W.D. Wash. Oct. 14, 2020) (denying motion to sever where case involved three similar yet separate transactions and the facts surrounding plaintiffs' purchases of the RVs at issue were "not identical"; although each plaintiff would have to testify "about what they were told, how they used and maintained their Keystone RVs, and the like," the expert testimony regarding adequacy of warnings, the effects of mold and formaldehyde, and the resulting impact on the RVs' value would be the same).[3]

This conclusion squares with "a number of cases" that support a "broad interpretation of 'transaction or occurrence' in the products liability context." *Rubio v. Monsanto Co.*, 181 F. Supp. 3d 746, 757 (C.D. Cal. 2016); *see, e.g.*, *Allen v. Similasan Corp.*, No. 12-CV-0376-BTM-WMC, 2013 WL 2120825, at *2 (S.D. Cal. May 14, 2013) (plaintiffs' claims arose out of the same series of transactions or occurrences where they purchased various homeopathic products from the same company based on the company's unsubstantiated advertising); *Simmons v. Skechers USA, Inc.*, No. 4:15-CV-340-CEJ, 2015 WL 1604859, at *4 (E.D. Mo. Apr. 9, 2015) ("[P]laintiffs here have filed suit against defendants for injuries caused by the same product and arising out of the same design, manufacture, and marketing practices—the same transactions[.]"); *Norwood v. Raytheon Co.*, No. EP-04-CA-127-PRM, 2007 WL 2408480, at *1, 4–5 (W.D. Tex. May 1, 2007) (claims

---

[3] Ford suggests that the Court "has already determined there are significant factual differences in the circumstances under which each individual Plaintiff was allegedly exposed to carbon monoxide in different vehicles." Dkt. No. 81 at 6–7. It quotes previous orders in which the Court found commonality and predominance lacking for purposes of Rule 23 class certification. *Id.*; *see* Dkt. No. 35 at 10–13; Dkt. No. 53 at 3–6. It is true "that the predominance analysis under Rule 23(b) and the single transaction or occurrence analysis under Rule 20(a) may, in some instances, be two sides of the same coin." *Corley v. Google, Inc.*, 316 F.R.D. 277, 286 (N.D. Cal. 2016). But the two inquiries remain distinct. *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1112 (9th Cir. 2018); *Brown v. Porter McGuire Kiakona & Chow, LLP*, No. 16-00448-LEK-KSC, 2017 WL 10647374, at *2 (D. Haw. Nov. 3, 2017). That the Court previously found Plaintiffs' allegations insufficient for purposes of class certification does not necessarily mean their claims arise out of a separate series of transactions, or—more broadly—that they are misjoined. *See Corley*, 316 F.R.D. at 287 (collecting cases in which courts denied class certification but permitted joinder).

arose from the same transaction or occurrence where two plaintiffs worked with same radiation equipment, despite the fact that plaintiffs worked for different nations' militaries over different periods of time).

The allegations in this case share more than "superficial similarit[ies]." *Visendi*, 733 F.3d at 870. In short, the subject matter of each plaintiff's claim is neither "sufficiently discrete" nor "so distinct that [six] separate trials, with [six] separate juries, is warranted." *Cascade Yarns*, 2013 WL 6008308, at *3. Rule 20(a)(1)(A) is therefore satisfied.

    2.   Common Questions of Law or Fact

Ford primarily contends that the Court need not reach Rule 20(a)'s second prong because Plaintiffs fail to satisfy the first. Dkt. 81 at 7. Ford does, however, briefly suggest in its reply brief that common questions of law or fact do not "permeate" this case because Plaintiffs have differing exposure and vehicle repair allegations. Dkt. No. 83 at 2, 4.

The Court disagrees for the reasons discussed above. Moreover, Ford's assertion elides the plain language of the rule, which requires "*any* question of law or fact common to all plaintiffs[.]" Fed. R. Civ. P. 20(a)(1)(B) (emphasis added). "It is important to keep in mind that the text of Rule 20 does not require a multitude of common questions or that common questions predominate[.]" *Gonzalez v. Wal-Mart Stores, Inc.*, No. 2:14-CV-00230-JCM-NJK, 2014 WL 2591690, at *8 (D. Nev. May 22, 2014). Rather, "there need only be a minimum of 'at least one common question of law or fact,'" and "[t]he fact that there may be questions that are not common to all [parties] does not defeat the showing on this requirement." *Id.* (quoting *Jacques v. Hyatt Corp.*, No. C11-05364-WHA, 2012 WL 3010969, at *4 (N.D. Cal. July 23, 2012)).

Plaintiffs satisfy this prerequisite. At least one factual issue is common to each claim in this case: the presence or absence of the alleged Exhaust Fume Defect. Moreover, Plaintiffs allege that repairs consisted merely of "replace[ment of] the warped parts that cause leaks with new

versions of the same part, which over time, result in the same leaks"—a "temporary fix to a permanent design flaw." Dkt. No. 78 at 30–31. There is also at least one common legal issue: every plaintiff must demonstrate that the harm he or she suffered was "proximately caused by the negligence of [Ford] in that the [Interceptor at issue] was not reasonably safe as designed[.]" Wash. Rev. Code § 7.72.030(1). More specifically, every plaintiff must show that at the time of manufacture, the likelihood that the Interceptor at issue "would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on [Ford] to design a product that would have prevented those harms" as well as "the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product[.]" *Id.* § 7.72.030(1)(a).

### 3. Fundamental Fairness

Ford last argues that "consideration of fundamental fairness compels severing Plaintiffs' individual claims for trial." Dkt. No. 81 at 7. As noted above, even when Rule 20(a)'s two threshold requirements are met, a district court must still determine whether joinder comports with the principles of fundamental fairness or would result in prejudice. *See Coleman*, 232 F.3d at 1280. "Factors relevant to the fundamental fairness inquiry 'may include judicial economy, prejudice, and whether separate claims require different witnesses and documentary proof.'" *Milton v. California*, No. 21-CV-08545-JST, 2022 WL 17978802, at *6 (N.D. Cal. Dec. 8, 2022) (quoting *Jacques*, 2012 WL 3010969, at *2).

With respect to judicial economy, Ford believes that joinder of "disparate claims" with "individual circumstances material to those claims . . . only serves to obstruct and delay, and does not expedite trial[.]" Dkt. No. 81 at 7. Ford fears that a joint trial will require "putting on evidence of each vehicle's history, service, [and] repair, and each officer's work history, schedule, medical treatment, and prognosis." *Id.* It therefore contends that documents and witnesses for each plaintiff

will be "largely dissimilar." *Id.* at 9. Ford also argues that it will be prejudiced from collective evidence admitted at trial. *Id.* at 8.

Here again the Court disagrees. As discussed at length above, Plaintiffs' claims will each entail unique and individualized proof to some degree; however, there will also be substantial overlap in terms of expert testimony and other documentary evidence. The disparities Ford identifies—for example, vehicle model year (for two of the six plaintiffs), vehicle service history, and plaintiff medical history, exposure, and treatment—are not of a sufficient magnitude to warrant severance. Any potential for jury confusion or undue prejudice can be satisfactorily mitigated through other protective measures. For example, "careful jury instructions will be sufficient to separate the allegations and evidence relevant to each claim, to the extent this is necessary." *Jacques*, 2012 WL 3010969, at *5; *accord Gonzalez*, 2014 WL 2591690, at *9. Nor does this case pose a threat to judicial economy. Indeed, six trials with six juries involving the same or similar issues would be far more detrimental to the interests of judicial economy than the delay or difficulty associated with accounting for any of the identified factual differences in one trial.

At base, this case does not involve the types of circumstances that would justify severance despite satisfaction of Rule 20(a)'s two requirements. *See, e.g.*, *Coleman*, 232 F.3d at 1296 (likelihood of prejudice and juror confusion outweighed gains from judicial economy in age discrimination case involving ten plaintiffs, where jury would have had to examine each plaintiff's employment history and the defendant employer's explanations for termination, the latter of which required the testimony of each plaintiff's supervisors and raters; moreover, plaintiffs worked in six different states and the jury would have had to evaluate their claims in light of the different laws of each state); *Milton*, 2022 WL 17978802, at *6 (case involving 52 named plaintiffs, a putative class of over 2,700 people, 20 named defendants, and a number of unidentified defendants would have required dozens of mini trials and risked jury confusion and undue prejudice because for each

claim, the named plaintiff had to prove a specific injury attributable to a particular defendant, and the requisite proof differed between two groups of plaintiffs).

Ford's motion to sever is denied. It has not shown that Plaintiffs' claims are misjoined, that severance is in the best interest of judicial economy, or that severance is necessary to protect the jury from confusion or prevent undue prejudice. The Court, however, recognizes that discovery may reveal additional facts that could alter this calculus. Ford may therefore renew its motion after discovery concludes and sufficiently in advance of trial if such facts arise.

### III. CONCLUSION

The Court DENIES Ford's Motion to Sever Plaintiffs' Claims for Trial. Dkt. No. 81. It further ORDERS Plaintiffs' counsel to provide a copy of this Order to her clients. Within seven days of the date of this Order, counsel shall certify by valid, signed declaration that she has done as instructed. The Court has repeatedly commented on counsel's continued and chronic failure to adhere to the applicable rules. This pattern is increasingly disturbing. Although counsel's latest infraction—an untimely opposition brief—does not supply the bad faith necessary to impose sanctions pursuant to the Court's inherent powers, *see Fink v. Gomez*, 239 F.3d 989, 993–94 (9th Cir. 2001), the Court finds it necessary to again reprimand counsel and apprise her of its expectations. Attorneys appearing before the Court must strictly adhere to the Local Civil Rules, the Federal Rules of Civil Procedure, and the Court's Standing Order for All Civil Cases. The Court will summarily strike future filings that fail to meet this requirement, including but not limited to untimely briefs.

Dated this 27th day of March, 2023.

*[signature: Lauren King]*

Lauren King
United States District Judge